---

DEVIN KEITT,

                                        Plaintiff,

            vs.                                        9:13-CV-850
                                                       (GLS/ATB)
T. HAWK, et al.,

                                        Defendants.

---

DAVID KEITT, Plaintiff pro se
MICHAEL G. McCARTIN, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c).  In this civil rights complaint, plaintiff alleges that defendants have violated his First Amendment right to practice his religion; his rights under the Religious Land Use and Institutionalized Persons Act, ("RLUIPA"), 42 U.S.C. § 2000cc-1(a); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq.; and the Rehabilitation Act, 29 U.S.C. § 794(a). (Amended Complaint "AC") (Dkt. No. 38).  Plaintiff also cites 42 U.S.C. §§ 1981, 1985, 1986, and 1988 as bases for his claims. (AC ¶ 1).  Finally, plaintiff claims that defendants have violated his First Amendment Free Speech rights; his Eighth Amendment right to be free from cruel and unusual punishment, his right to Equal Protection, and his right to Due Process.  Plaintiff seeks injunctive and substantial monetary relief. (AC at 63-64).

Presently before the court is defendants' motion for summary judgment pursuant

to Fed. R. Civ. P. 56. (Dkt. No. 67). Plaintiff has responded in opposition to the motion and has cross-moved for summary judgment in his favor. (Dkt. No. 73). Defendants have responded in opposition to plaintiff's cross-motion. (Dkt. No. 74). Plaintiff has filed some additional documents in support of his motion. (Dkt. No. 76). For the following reasons, this court agrees with defendants and will recommend granting their motion for summary judgment and denying plaintiff's cross-motion for summary judgment.

## DISCUSSION

## I.    Facts and Contentions

This case was transferred from the Southern District of New York on July 18, 2013, after being filed on March 28, 2012.[1] (Complaint "Compl.") (Dkt. No. 1). Plaintiff filed his second amended complaint ("SAC") March 18, 2013.[2] (Dkt. No. 38). The second amended complaint lists fifteen defendants in the caption, eleven defendants in the section entitled "Parties," and thirteen defendants in the body of the second amended complaint. (*See* SAC Caption; ¶¶ 4-12; 15, 37, 53, 70, 83, 97, 136, 150, 172, 187, 205, 236, 250). The caption lists the following defendants: T. Hawk; M. Lira; D. Uhler; J. Otis; D. Rock; B. Fischer; J. Bellnier; D. Martuscello; P. Melecio; C. Miller; D. Ali; A. Perez; E. Killar; State of New York; and the New York State Department of Correction and Community Supervision ("DOCCS").

---

[1] The original complaint was signed on March 25, 2012. (Compl. ¶ 208).

[2] Plaintiff also filed a first amended complaint prior to the transfer to this district. (Dkt. No. 31). The second amended complaint is the operative pleading herein, and the court will refer to that document unless otherwise noted.

Two of the defendants in the caption of the complaint (A. Perez[3] and E. Killar[4]) are not even mentioned in the body of the complaint. In addition, defendants Miller, Martusciello, Melecio, Perez, Killar, and Bellnier have not been served with the original or the amended complaint.[5] The remaining defendants who have been served are: T. Hawk; M. Lira; D. Uhler; J. Otis; D. Rock; B. Fischer; DOCCS; State of New York; and Dr. Ali. The claims relating to plaintiff's Ramadan meal allegations occurred at Upstate Correctional Facility ("Upstate"), while his religious clothing claims are asserted against defendants at Coxsackie Correctional Facility ("Coxsackie"). Defendants Fischer and Bellnier are supervisory defendants, who work or worked[6] in Albany.[7]

### A. Defendants Fischer, State of New York, and DOCCS and Upstate Defendants: Hawk, Lira, Uhler, Otis, Rock

Plaintiff alleges that he is of the Muslim faith, is dyslexic, cannot read or write, is a Type-A Diabetic, and has a bullet lodged in his head. Plaintiff states that he must

---

[3] Ada Perez is the Superintendent at Downstate Correctional Facility.

[4] E. Killar appears to be the Inmate Grievance Program ("IGP") Supervisor at Coxsackie. (Dkt. No. 59-1 at CM/ECF p.14).

[5] Defense counsel notes that these defendants have not been served, and thus, counsel does not represent them. Because the complaint may be dismissed on other bases as discussed below, and plaintiff has made no allegations against some of the non-served defendants, the court finds that notwithstanding the failure to serve, the complaint may be dismissed as against all these defendants.

[6] Defendant Fischer is no longer the Commissioner of DOCCS. Anthony J. Annucci is currently the Acting Commissioner, appointed by Governor Cuomo on May 1, 2013. *See* www.doccs. ny.gov/Annucibio.htm

[7] Plaintiff originally named Lucian LeClaire, another Deputy Commissioner, but this defendant was dropped from plaintiff's second amended complaint.

take medication with food three times per day. (SAC ¶¶ 16-17). Plaintiff states that if he does not take his medication with food, he becomes ill. Plaintiff states that because of these medical restrictions, he cannot participate in the fasting required during Ramadan. (SAC ¶¶ 18-19). Notwithstanding his inability to fast, plaintiff claims that he should be able to "observe the Ramadan fast by receiving Ramahdan [sic] food with everybody else . . . ." (SAC ¶ 19). Plaintiff alleges that on September 1, 2008 and in August of 2010, defendants did not allow plaintiff to obtain the special meal "because of his disability." (SAC ¶ 20). The special meal is served after sundown, to inmates who have fasted during the day. Plaintiff claims that this policy violates his First Amendment rights and his rights under RLUIPA. Plaintiff also claims that providing plaintiff the extra meal at Upstate would be "accommodating" plaintiff's disability under the ADA. (SAC ¶ 30). Plaintiff alleges that defendants Hawk, Lira, and Uhler "conspired" to deprive plaintiff of Equal Protection or "Privileges and Immunities," and states that there is some "racial or perhaps otherwise class based invidious discriminatory animus." (SAC ¶ 34). Plaintiff also attempts to allege some sort of "retaliation" by defendant Hawk by claiming that he "carried out a threat" to prevent plaintiff from participating in the required feast because plaintiff "indicated an intention" to file a lawsuit for excluding him from this "religious experience." (SAC ¶ 31).

Plaintiff repeats almost identical paragraphs against defendants M. Lira, the Deputy Superintendent for Programs at Upstate; D. Uhler, the Upstate Deputy Superintendent of Security; and J. Otis, the Deputy Superintendent for Administration

at Upstate, including the allegation that defendants Lira, Uhler, and Otis carried out a "threat" because plaintiff stated his "intention" to file a law suit. (SAC ¶¶ 37-51 (Lira), 53-68 (Uhler), 70-81 (Otis)). The claims against defendant Rock are also identical, except that plaintiff alleges defendant Rock's involvement only as to the 2010 incident. (SAC ¶ 83, 84-95).

Plaintiff claims that former DOCCS Commissioner Fischer was responsible for the unconstitutional conduct of his subordinates because he "failed to follow guidelines implementing proper procedure and policies to ensure/enforce [state and federal laws and directives]." (SAC ¶ 100). Plaintiff claims that this defendant was "made aware" of the violations based upon "appeals from C.O.R.C.," and that defendant Fischer should have known that there were disabled inmates who needed "accommodations." (SAC ¶ 103).

## B. Defendants Fischer, Bellnier, State of New York, and DOCCS and Coxsackie Defendants: Martuscello, Melecio, Miller, and Ali

Plaintiff repeats the religious meal claims against defendant Fischer, but adds claims that plaintiff is not allowed to wear his religious headgear, known as a kefiya, turban, faus, or fezs at all times. (SAC ¶¶ 112-18). These religious clothing claims originated after his transfer to Coxsackie. He makes the same claims about his religious robe or Jālābiyah. (SAC ¶¶ 128-34). Plaintiff has requested permission to wear these head coverings "throughout the facility and on outside trips." (SAC ¶¶ 118, 132). Plaintiff states that the turban must be nine feet long, and the kefiya may be 52 by 52 or 72 by 72 inches. (SAC ¶ 120). Plaintiff states that he is only allowed to wear

these head coverings "in one place" and at religious services, but those inmates who are Sikhs are allowed to wear their turban headgear at all times. (SAC ¶¶ 115-16). Plaintiff alleges that this shows intentional discrimination against Muslims.

Plaintiff also alleges that because he is dyslexic and cannot read, he is entitled to be provided with the "reasonable accommodation" of religious "books on tape" or "auxiliary aides [sic]," while attending religious classes. (SAC ¶¶ 122-27). Plaintiff claims that he informed defendant Fischer that plaintiff "sincerely believes" that he must wear his Jālābiyah Religious Robe. Defendants allow him to wear the robe only "at one place" in the facility and during religious services only. (SAC ¶¶128-29). Plaintiff claims that other inmates are allowed to wear their "Jackits [sic]" throughout the facility and on outside trips, but when he requested permission to do so, he was denied.[8]

---

[8] All of plaintiff's religious clothing and "books on tape" claims relate to incidents that occurred at Coxsackie. Plaintiff's claims against non-served defendant Bellnier track the language of the claims against defendant Fischer with respect to the religious head covering and robe. (SAC ¶¶ 137-49). Plaintiff's claims against non-served defendant Coxsackie Superintendent D. Martuscello relate to excluding plaintiff from participating in Ramadan religious class in 2012 "because of his disability," by failing to provide him with Auxiliary Aids and books on tape, after being told by plaintiff that he was dyslexic and could not read or write without "reasonable accommodation." (SAC ¶ 153-54). Plaintiff also claims that the reasons for denying him these items were related to "the color of his skin and the texture of his hair." (SAC ¶ 158). Plaintiff repeats his clothing claims against defendant Martuscello. (SAC ¶¶ 162-71). With respect to non-served defendant P. Melecio, the Deputy Superintendent of Programs at Coxsackie, plaintiff claims that he repeatedly requested "reasonable accommodations," but that defendant Melicio responded to a grievance on April 19, 2012, stating that Dyslexia was not a medical condition that required reasonable accommodation pursuant to DOCCS Directive No. 2614. (SAC ¶ 175). Plaintiff also claims that this defendant retaliated against him after he found out that plaintiff was filing grievances against him by "deliberately blocking his access to religious services" by refusing to add his name to the authorization list that he provides to the general population. (SAC ¶ 177). Plaintiff was excluded from all services because his name was not on the call out for services. (SAC ¶ 182). With respect to defendant C. Miller, a Coxsackie "employee" plaintiff repeats the religious clothing claims and alleges that defendant Miller also carried out a "threat" based on plaintiff filing a lawsuit. (SAC ¶ 200).

Plaintiff claims that Dr. Ali, a Muslim chaplain, denied plaintiff the right to have books on tape and "Auxiliary Aides [sic]." (SAC ¶¶ 207-208). Plaintiff also alleges that defendant Ali refused to put plaintiff on the call-out for Friday religious services in "retaliation" after defendant Ali found out that plaintiff was filing grievances against him. (SAC ¶ 210). Plaintiff also raises the religious clothing claims against this defendant. (SAC ¶¶ 225-35).

Plaintiff's last two served defendants, the State of New York and DOCCS, which plaintiff holds responsible for all his claims, including the Ramadan meals in 2008 and 2010, the religious clothing claims, and "reasonable accommodation" claims. (SAC ¶¶ 236-303).

Defendants have filed a substantial number of exhibits, including plaintiff's deposition, declarations by defendants and non-defendants, and decisions from a previous Northern District of New York case, brought by plaintiff in 2010. (Dkt. No. 67-2–67-26). Rather than detail all the defendants' facts at the outset, I will discuss the evidence as I analyze the issues presented by defendants' motion.

## II.  <u>Summary Judgment</u>

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). It must be apparent that no

rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin v. Goord*, 467 F.3d at 272.

## III.    Statute of Limitations

### A.    Legal Standards

Federal courts borrow the state law personal injury statute of limitations period for purposes of filing section 1983 actions. *Wilson v. Garcia*, 471 U.S. 261, 276 (1985). In New York State, the relevant limitations period is three years. *Owens v. Okure*, 488 U.S. 235, 250–51 (1989). *See* N.Y. Civ. Prac. L & R. § 214(5). Thus, unless the limitations period is tolled for some reason, a plaintiff must file his section 1983 civil rights action within three years of the accrual of each cause of action.

8

Federal law governs the question of when a section 1983 claim accrues. *Covington v. City of New York*, 171 F.3d 117, 121 (2d. Cir. 1999) (citing *Morse v. University of Vermont*, 973 F.2d 122, 125 (2d. Cir. 1992)). Generally, under federal law, a cause of action accrues when "the plaintiff knows or has reason to know of the injury which is the basis of his action." *Id.* (quoting *Singleton v. City of New York*, 632 F.2d 185, 191 (2d Cir. 1980) (internal quotation marks omitted)). Although federal law determines when a section 1983 claim accrues, state tolling rules determine whether the limitations period has been tolled. *Abbas v. Dixon*, 480 F.3d 636, 641 (2d Cir. 1997).

## B. Application

Defendants argue that any claims regarding plaintiff's Ramadan meal which accrued during Ramadan 2008 are barred by the statute of limitations. This court agrees. Plaintiff claims that Ramadan was in September of 2008, during which time, he alleges that he was not allowed to obtain the "fast" breaking meal each evening. Even assuming that the last such meal occurred on September 30, 2008, plaintiff did not file this action in the Southern District of New York until March 28, 2012. (Dkt. No. 1). The three-year statute of limitations has clearly run.[9]

Plaintiff concedes that he knew his rights were being violated in 2008. However, plaintiff argues that the statute of limitations for the 2008 claims should be equitably

---

[9] This is true even if the court uses March 25, 2012 (the date plaintiff signed his original complaint) as the date of filing. The Supreme Court has held that an inmate's papers may be deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court. *Houston v. Lack*, 487 U.S. 266 (1988). This rule became known as the "prison mailbox rule," and has been applied to inmates filing complaints for purposes of the statute of limitations. *See Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), modified on other grounds, 25 F.3d 81 (2d Cir. 1994).

tolled because of his dyslexia, claiming that "there [were] no policies and/or procedures in place to [e]nsure Plaintiff [was] afforded a reasonable accommodation to participate in the law library." (Dkt. No. 73-1 at 4) (alterations in original). He alleges that he has been pursuing his rights "diligently," and that DOCCS policies caused the untimeliness of his complaint. *Id.*

The doctrine of equitable tolling allows the court to extend the statute of limitations past the time of expiration as necessary to avoid inequitable circumstances. *Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (citation omitted). In order to apply equitable tolling, the court must find that "extraordinary circumstances" prevented the plaintiff from performing the required act, and that plaintiff acted "with reasonable diligence" during the period that he seeks to toll. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (quoting *Doe v. Menefee*, 391 F.3d 159 (2d Cir. 2004)).

Although on the surface, plaintiff's argument might have some appeal, the court notes that plaintiff brought an action in the Northern District of New York in 2010, in which he made claims regarding his ability to read and regarding his inability to properly participate in a disciplinary hearing.[10] *Keitt v. Annetts*, No. 10-CV-157 (TJM/CFH). In 10-CV-157, plaintiff made claims regarding disciplinary hearings that

---

[10] The court notes that plaintiff's alleged dyslexia was discussed at length in Magistrate Judge Christian Hummel's Order and Report-Recommendation which recommended granting the defendants' motion for summary judgment as to plaintiff's ADA and Fourteenth Amendment claims and dismissing plaintiff's action "with prejudice." (Dkt. No. 98, 10-CV-157 at 3-5). Senior District Judge Thomas McAvoy adopted Magistrate Judge Hummel's recommendation on February 15, 2013, and the Second Circuit dismissed plaintiff's appeal from Senior Judge McAvoy's decision because "it lacks an arguable basis in law or in fact. *See* 28 U.S.C. § 1915(e); *Neitzke v. Williams*, 490 U.S. 319, 325 (1989)." (Dkt. Nos. 102 and 110 in 10-CV-157). Defendants have included copies of all three court decisions as exhibits to their motion in this case. (Dkt. No. 67-4 — 67-6).

occurred in 2007 and in November of 2008, approximately 2 months after the Ramadan incidents that plaintiff is attempting to raise in this action. No rational fact finder could conclude that plaintiff was prevented from using the law library or from having someone assist him in 2010, when his 2008 religious food claims would have been timely. Plaintiff cannot plausibly argue that DOCCS "policies" prevented him from bringing a timely claim, and his equitable tolling argument must fail. Thus, any claims regarding his Ramadan meals from 2008 must be dismissed as time barred.

## IV. Personal Involvement (Ramadan Meal)

### A. Legal Standards

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or

event.  *Id.  See also Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. *See Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases).  However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*. *Id.*  In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.'" *Id*. (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)).  This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of the named Upstate defendants and defendant Fischer.  Accordingly, no damages may be assessed against them.

### B.    Application

During his deposition, plaintiff was asked why he named defendants Hawk, Lira, Uhler, Otis, Rock, and Fischer. (Pl.'s Dep. at 114-25).  Plaintiff testified that he named these defendants because they were "policy makers," and they "created" the policy which excluded plaintiff from participating in his religious exercise. (*Id.*)  With respect to defendant Fischer, plaintiff testified that Fischer "upheld" every CORC determination. (Pl.'s Dep. at 123).  Plaintiff did not know whether defendant Fischer

ever actually reviewed the appeals of his grievances, but plaintiff testified that the people Fischer appointed would "rubberstamp" defendant Fischer's signature. (*Id.* at 124). Plaintiff stated that he was not sure whether defendant Fischer ever signed a CORC determination. (*Id.*) Essentially, plaintiff conceded that he only named defendant Fischer because he was a "policy maker," without specific reference to his personal involvement in any of the alleged violations. (*Id.*)

Plaintiff's testimony describes the doctrine of respondeat superior, and therefore, he has failed to allege the personal involvement of defendants Hawk, Lira, Uhler, Otis, Rock, and Fischer. However, even if plaintiff had made the proper allegations, defendants have come forward with sworn evidence, showing that none of these defendants were, or could have been, personally responsible for inmates' diets, religious or otherwise.

Defendants have filed the declaration of Elizabeth Culkin,[11] the Assistant Director ("Ass't Dir.") of DOCCS Office of Nutritional Services ("ONS"). (Culkin Decl. ¶ 1) (Dkt. No. 67-12). In her declaration, Ass't Dir. Culkin states that the ONS is under the supervision of DOCCS Deputy Commissioner of Administrative Services, and ONS is responsible for providing nutritionally adequate meals for DOCCS' "approximately 54,700 inmates." (Culkin Decl. ¶ 4). Ass't Dir. Culkin states that she is responsible for providing guidance with respect to DOCCS nutrition policies and procedures, and that "absent an emergency, the correctional officials at an individual facility like Upstate . . . do not have the authority to deviate from the general

---

[11] Assistant Director Culkin is not a defendant in this action.

13

confinement menu without the approval of [ONS]." (Culkin Decl. ¶ 4).

Based upon Ass't Dir. Culkin's declaration, none of the Upstate defendants named by plaintiff in this case could have had any responsibility for plaintiff's diet or for changing the diet at plaintiff's request. Personal involvement requires that the individual who is, or becomes aware of, the violation, have the ability to take action to correct the problem. *See Conklin v. City of Suffolk*, 859 F. Supp. 2d at 441-42 (personal involvement requires knowledge and the ability to take action). Supervisory individuals such as defendants Fischer, Lira, Hawk, Uhler, Otis, and Rock would not have the expertise to determine what meals, or how many meals, a diabetic inmate (or any inmate) should or should not eat. Defendants Rock, Uhler, Lira, Otis, and Hawk each submit a declaration affirming that the dietary decisions about which plaintiff complains are strictly governed by ONS, and none of them have any responsibility for creating or changing any inmate's diet, regardless of whether the diet is therapeutic[12] or whether the inmate is eating the food served to the general population.[13] (Rock Decl. ¶¶ 2-5; Uhler Decl. ¶¶ 2-5; Lira Decl. ¶¶ 2-5; Otis Decl. ¶¶ 2-5; Hawk Decl. ¶¶ 2-5). In addition, and as discussed further below, the DOCCS Medical Nutrition Therapy

---

[12] In his response to the defendants' motion for summary judgment, plaintiff claims that although he is diabetic, and he was on a "therapeutic" diet in 2008, he was no longer on a "calorie controlled diet" in 2010. (Dkt. No. 73-1, ¶ 11, Pl.'s Dep. at 92). Ass't Dir. Culkin assumes in her affidavit that plaintiff was on a "controlled therapeutic menu for inmates." (Culkin Decl. ¶ 18). The court notes that its analysis of personal responsibility and the following analysis of plaintiff's First Amendment claim would be the same whether or not plaintiff was on a therapeutic diet in 2010.

[13] Even though defendant Fischer has not submitted a declaration, it is clear that as the former Commissioner, who was not even at Upstate, he would not have been responsible for plaintiff's dietary requirements or requests.

14

Manual specifically provides that therapeutic diets must be prescribed by an authorized health care provider, and that combinations of religious menus and therapeutic diets are not offered. (DOCCS Medical Nutrition Therapy Manual at 7, ¶ 6) (Def.s' Ex. B; Dkt. No. 67-14). Thus, the Upstate defendants and defendant Fischer had no personal involvement in plaintiff's diet, and any claim for damages may be dismissed on that basis. Plaintiff requests only damages for his religious dietary claims. Thus, all his claims relating to incidents at Upstate may be dismissed. Even if plaintiff were asking for injunctive relief or had named someone who was actually responsible for his diet (which would have allowed him to request monetary damages), plaintiff's claims would fail on the merits.

## V. Religion Claims

### A. Legal Standards

#### 1. First Amendment

Inmates have the right under the First and Fourteenth Amendments to freely exercise a chosen religion. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003) (citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974)). However this right is not limitless, and may be subject to restrictions relating to legitimate penological concerns. *Benjamin v. Coughlin*, 905 F.2d 571, 574 (2d Cir. 1990). The analysis of a free exercise claim is governed by the framework set forth in *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987) and *Turner v. Safely*, 482 U.S. 78, 84 (1987). This framework is one of reasonableness and is less restrictive than the standard ordinarily applied to the alleged infringements of fundamental constitutional rights. *Ford*, 352 F.3d at 588.

In *O'Lone*, the Supreme Court held that a regulation that burdens a protected right withstands a constitutional challenge if that regulation is reasonably related to legitimate penological interests. 482 U.S. at 349 (quoting *Turner*, 482 U.S. at 89). An individualized decision to deny an inmate the ability to engage in a religious exercise is analyzed under the same standard. *Salahuddin v. Goord*, 467 F.3d 263, 274 n.4 (2d Cir. 2006) (citations omitted). In *Farid v. Smith*, 850 F.2d 917, 926 (2d Cir. 1988), the Second Circuit held that to assess a free exercise claim, the court must determine "(1) whether the practice asserted is religious in the person's scheme of beliefs and whether the belief is sincerely held; (2) whether the challenged practice of prison officials infringes upon the religious belief; and (3) whether the challenged practice of the prison officials furthers some legitimate penological interest."

The Second Circuit has examined the standard for analyzing a First Amendment religion claim. *Holland v. Goord*, 758 F.3d 215, 220-23 (2d Cir. 2014). In *Holland*, the court discussed the degree of burden required for a First Amendment claim. *Id.* at 220-21. The Second Circuit has not decided whether, to state a claim under the First Amendment, the inmate must show at the onset that the disputed conduct "substantially burdens his sincerely held religious beliefs." *Id.* at 220 (citing *Salahuddin, supra* at 274-75; *Ford, supra* at 592 (where the court assumed without deciding that the substantial burden test applies)). While the court in *Holland* did not decide the issue, it assumed the continued validity of the substantial burden test and analyzed the case

accordingly.[14] *Id.* at 221. This court will follow the analysis in *Holland* and will consider the First Amendment claim, assuming that the substantial burden test is still valid.

Once a substantial burden is found, the court must examine whether the challenged action has a legitimate, rational connection to the governmental objective; whether prisoners have alternative means of exercising the burdened right; the impact on guards, inmates, and prison resources of accommodating that right; and the existence of alternative means of facilitating the exercise of that right that have only a *de minimis* adverse effect on the valid penological interests. *See King v. Bennett*, No. 02-CV-349, 2007 WL 1017102, at *4 (W.D.N.Y. March 30, 2007) (citing *Salahuddin*, 467 F.3d at 274). Finally, once prison officials state a legitimate penological interest to justify their actions, the burden shifts to plaintiff to show that the defendants' concerns are "irrational." *Ford*, 352 F.3d at 595.

## 2.    Religious Land Use and Institutionalized Persons Act

RLUIPA provides that

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person -

(A) is in furtherance of a compelling governmental interest; and

(B) is the least restrictive means of furthering that compelling governmental

---

[14] This finding was supported by the fact that the court's "precedent squarely dictat[ed] that Holland's religious exercise was unconstitutionally burdened," a point that the defendants in that case did not challenge on appeal. *Holland*, 758 F.3d at 221.

interest.

42 U.S.C. § 2000cc-1(a). Under RLUIPA, the plaintiff bears the burden of showing that his religious exercise has been burdened and that the burden is substantial.[15] *Marria v. Broaddus*, 200 F. Supp. 2d 280, 297 (S.D.N.Y. 2002) (citing 42 U.S.C. § 2000cc-2(b)). The burden then shifts to the government to show that the limitation furthers a compelling governmental interest **and** that it is the ***least restrictive*** means of achieving that interest. *Id.* The act defines "religious exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A).

### B.    Application

#### 1.    Religious Meals

##### a.    RLUIPA

As stated above, in plaintiff's second amended complaint, he asks only for damages with respect to his dietary claims. Monetary damages are not available under RLUIPA. *Sosamon v. Texas*, __ U.S. __, 131 S. Ct. 1651, 1659 (2011); *Holland v. Goord*, 758 F.3d at 224. Additionally, plaintiff has been transferred out of Upstate, where the alleged violations occurred. An inmate's transfer from a prison generally moots claims for declaratory and injunctive relief against officials of that facility. *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). Thus, to the extent that plaintiff could have requested injunctive relief, that request would be moot as against

---

[15] RLUIPA uses the term "substantial burden" in the language of the statute, removing any ambiguity with respect to the extent of the burden required to establish a statutory claim.

the individuals at that Upstate,[16] and plaintiff's RLUIPA claim, relating to his Ramadan meals may be dismissed.

## b.    First Amendment

The Free Exercise Clause applies to an inmate's diet and participation in religious meals. *McEachin v. McGuinnis*, 357 F.3d at 204-205; *Ford*, 352 F.3d at 597. The Constitution requires that an inmate be provided, at a minimum, with nutritionally adequate meals, "but otherwise retain 'considerable discretion' over dietary decisions." *Smith v. Perlman*, No. 9:11-CV-20, 2014 WL 7333229, at *10 (N.D.N.Y. Dec. 19, 2014)[17] (quoting *Walker v. Fischer*, No. 9:10–CV–01431, 2012 WL 1029614, *6 (N.D.N.Y. Mar. 26, 2012)).  It has generally been found that to deny an inmate food that satisfies the dictates of his faith does unconstitutionally burden the inmate's free exercise rights." *Id.* (quoting *McEachin*, 357 F.3d at 203).  However, courts are "'reluctant to grant dietary requests when the cost is prohibitive, or the accommodation

---

[16] In *Blalock v. Jacobsen*, No. 13-CV-8332, 2014 WL 5324326, at *3 & n.2 (S.D.N.Y. Oct. 20, 2014), the court discussed the possibility that RLUIPA claims for injunctive relief might not be moot upon an inmate's transfer if the "Commissioner's" policy continued to burden and adversely affect the plaintiff's rights, under the theory that the violation is capable of repetition, yet evades review. *Id.* (citing *Pugh v. Goord*, 571 F. Supp. 2d 477, 507 (S.D.N.Y. 2008)).  As stated above, plaintiff does ***not ask*** for injunctive relief as to his dietary claims as he does with respect to his religious clothing claims.  Plaintiff clearly knows the difference between asking for one type of relief or another.  Thus the court's recommendation of dismissal is based substantially on the fact that plaintiff has not requested injunctive relief.  Finally, defendant Fischer is no longer the Commissioner of DOCCS, and thus, would not be subject to the request for injunctive relief in any event.

[17] The defendants cite Magistrate Judge Christian Hummel's Report-Recommendation in *Smith v. Perlman*.  However, the court notes that District Judge Mae A. D'Agostino has issued a very recent decision in that case, granting reconsideration of her March 14, 2014 order which was decided without objections.  Judge D'Agostino accepted plaintiff's late objections, granted reconsideration, but still concluded that defendants were entitled to summary judgment dismissing plaintiff's complaint. 2014 WL 7333229 at *17.  Thus, the court will cite to Judge D'Agostino's recent decision in this matter.

is administratively unfeasible.'" *Id.* (quoting *Benjamin*, 905 F.2d at 579 (citations omitted)).

At the times in question, plaintiff was a practicing Muslim.[18]  There is no dispute that during Ramadan, practicing Muslims are required to fast during the day.  After sundown, the individuals who participate in the fast are served a special meal to break the fast.  Plaintiff has been diagnosed with diabetes.  Although he disputes whether he was on a specific therapeutic meal plan in 2010,[19] he states in his amended complaint that, during the time in question, he was required to take his medication with food, and thus, he was not able to fast during the day.  However, he believes that in addition to his three regular meals, he was entitled to be served the special meal, given to those inmates who participated in the fast, even though he did not do so.  This would involve

---

[18] The court notes that during his deposition, plaintiff testified that in 2009, he changed his religion to Jewish so that he could receive the Jewish meals which were "hermetically sealed." (Pl.'s Dep. at 94).  Plaintiff testified that he did this because he was the subject of "retaliation" by officers spitting in his food, and thus, he changed his religion to Jewish so that this could not happen. (*Id.* at 95-96).  He changed his religion back to Muslim when he got "out of the Upstate box." (*Id.* at 98). Plaintiff's Inmate Transfer History indicates that he was transferred from Upstate SHU to Elmira General Population on September 8, 2009, where he stayed until July 29, 2010. (Ali Decl. Ex. A) (Dkt. No. 67-16).  On July 29, 2010, he was transferred back to Upstate SHU due to "Unsuitable Behavior," and he stayed at Upstate until October 5, 2010, when he was transferred to Attica. (*Id.*)  Although plaintiff testified that he returned to Upstate in 2011 (Pl.'s Dep. at 100), that is not correct.  Plaintiff's transfer history indicates that he never went back to Upstate after October 5, 2010. (Ali Decl. Ex. A). Although plaintiff's testimony about when he was at Upstate was confusing, the court finds that he was at Upstate during Ramadan of 2010.

[19] Although plaintiff made this statement at his deposition, the court notes that in is original complaint, he submitted the Superintendent's response to his grievance, asserting inter alia, that he was denied his Ramadan meal. (Complaint "Compl." at CM/ECF p.45).  In pertinent part, the Superintendent's response reads: "Grievant was advised that he cannot receive both ***special diet meals*** and Ramadan meals as he requests." (*Id.*) (emphasis added).  It appears from this grievance that plaintiff was, in fact, on a special diet during Ramadan 2010.  The court finds that regardless of whether plaintiff was on a specific special diet, the analysis of his constitutional and statutory claims remains the same.

being served a fourth meal after sunset at approximately 7:30 p.m.,[20] when he had already eaten his third meal of the day at approximately 4:00 p.m. (SAC ¶ 30, Pl.'s Dep. at 92). Plaintiff alleges that defendants' refusal to allow him to participate in the Ramadan meal during the 2010 holiday violated his First Amendment rights.

As background, in her declaration, Asst. Dir. Culkin states that in addition to the state-wide menu, DOCCS has a Religious Alternative Menu ("RAM"), initiated in 1996, which was designed to accommodate the needs of inmates who may have "different dietary requirements due to their religious beliefs or personal dietary beliefs," and is available to any inmate who wants it, regardless of religious affiliation. (Culkin Decl. ¶¶ 6-8). The RAM program is served at the same time and in the same fashion as the regular menu, but provides an alternative to the meat entrees. (Culkin Decl. ¶ 8).

In order to accommodate Muslim inmates, who do not eat pork, DOCCS serves a pork entree only once per month and offers a pork alternative at that meal. (Culkin

---

[20] Plaintiff's response to defendants' motion contains an exhibit entitled "Ramadan-2012." (Dkt. No. 73-1 at 18). This exhibit is a memorandum from the Superintendent at Green Haven, dated July 9, 2012 and would not have been applicable to plaintiff's case. However, attached to plaintiff's original complaint is a Memorandum from defendants Hawk, Lira, Uhler, and Otis, dated July 30, 2010, which outlines the procedures for the Ramadan Fast 2010. (Compl. at CM/ECF p.46). This memorandum states that the fast participants will gather in the Mosque and Transitional Services room at 7:30 p.m. and pray. (*Id.*) At sunset the inmates break the fast with dates that they saved from the previous night, and after the Maghrib Prayer, the inmates would go to the Mess hall and eat their Ramadan meals. (*Id.*) This memorandum applies only to CADRE inmates. Plaintiff, like most of the inmates at Upstate, was in SHU and would not have been allowed to attend congregate services in any event. However, there are inmates at Upstate in the CADRE program, who are the only general population inmates at Upstate and who are responsible for cleaning the buildings and grounds keeping. *See Weathers v. Rock*, No. 9:12-CV-1301, 2014 WL 4810309, at *2 (N.D.N.Y. Sept. 23, 2014), approving Rep't Rec. dated August 6, 2014) (NAM/ATB). The memorandum attached by plaintiff would not have applied to him relative to any congregate services, and I cite this memorandum only for the statement that the Ramadan meal would be served after sunset at 7:30 p.m. as plaintiff alleges in his papers.

Decl. ¶ 9).  In addition, once per week, the RAM provides a "halal" meat entree, which is also provided to Muslim inmates during Muslim holy feast days of Eid-ul-Fitr and Eid al-Adha, and during Ramadan.[21]  (Culkin Decl. ¶ 11).  Inmates are also allowed to supplement their halal meats with facility commissary purchases or care packages from home. (Culkin Decl. ¶ 13).  Ass't Dir. Culkin states that to meet the dietary requirements for religious observances such as Ramadan, ONS works in conjunction with the Division of Ministerial, Family, and Volunteer Services to develop a religious holiday menu. (Culkin Decl. ¶ 17).

As stated above, the DOCCS Medical Nutrition Therapy Manual states that religious menus must be strictly followed and may not be combined with medical therapeutic diets. (Culking Decl. ¶ 19 & Def.s' Ex. B at 7).  The manual also provides that in general, double portions are not considered therapeutic and are not provided. (Def.s' Ex. B at 7).  Ass't Dir. Culkin states that the purpose of the special Ramadan meal, served to fasting Muslims after sundown, is to provide participating individuals with a meal to break their fast.  Allowing plaintiff to participate in this meal would essentially give him four meals, and a substantial number of extra calories, per day.[22]

Inmates who are on therapeutic diets may choose to participate in the Ramadan

---

[21] Asst. Dir. Culkin also describes the Cold Alternative Diet ("CAD") that is available to Jewish inmates and is DOCCS' kosher menu. (Culkin Decl. ¶ 14).

[22] During his deposition, for the first time, plaintiff tried to claim that his regular meals at Upstate were deficient in calories, and thus, having the fourth meal would not have increased his calorie intake substantially. (Pl.'s Dep. 121-23, 138).  Plaintiff testified that this calorie restriction was a form of "torture" used at Upstate. (*Id.* at 121).  Plaintiff did not mention this allegation in his second amended complaint, and thus, the court does not consider this random statement as part of plaintiff's case.

morning and evening meals "if approved by Health Services personnel," and those inmates are excused from picking up their special diet meals at the regularly scheduled times. Their medical diets resume immediately after Ramadan ends. (Culkin Decl. ¶ 21). Thus, if medically appropriate, inmates may participate in the therapeutic meal **or** the Ramadan meals, but **may not do both at the same time** as plaintiff wished to do. (*Id.*) Ass't Dir. Culkin states that allowing an inmate to participate in both meal plans at the same time would "defeat the purpose of the therapeutic diet meals as well as the religious fast of Ramadan." (*Id.*) If plaintiff did not fast for Ramadan, nutritionally, there was no reason for a special meal to "break" the fast. (*Id.*) In addition, therapeutic meals for an inmate with diabetes "are designed to control carbohydrate and calorie intake." (*Id.*) Adding another evening meal would "significantly increase the total carbohydrate and calorie levels." (*Id.*)

In *Smith v. Perlman*, the court granted summary judgment for defendants on a similar, but not identical issue. The plaintiff in *Smith* was on a "Controlled A" therapeutic diet, and could not eat the RAM diet for medical reasons. Defendants in *Smith* refused to serve plaintiff a special menu combining the elements of the RAM diet with the Controlled A diet. The court found that the defendants' refusal to combine the menus was "justified by the legitimate penological concern of meeting the disparate needs of approximately 54,700 inmates in an economically feasible way." 2014 WL 7333229, at *11. The court held that there was clearly a rational relationship between the legitimate penological interest and the defendants' policy, which offers numerous menus, tailored to meet the needs of different inmates. *Id.* The defendants' refusal to

permit plaintiff to incorporate RAM entrees of his choosing into his diet "also serves the legitimate purpose of maintaining the therapeutic integrity of the medical diet." *Id.* The plaintiff in *Smith* offered "no viable less restrictive means of accommodating his rights that [were] consistent with Defendants' valid penological interests." *Id.* at *12.

Plaintiff in this case does not claim that he was unable to obtain food which met his religious dietary requirements. He does not allege in his second amended complaint that his meals were nutritionally inadequate. Instead, he claims that he could not participate in the meal to break a fast in which he was not participating. Participation in this meal would involve plaintiff obtaining extra food which would not be consistent with his medical requirements.[23] The refusal to allow plaintiff to obtain extra food in an amount that would be medically contraindicated, particularly when he had not participated in the fast during the day, serves a legitimate penological interest and is rationally related to that interest.

A policy which prohibits mixing different types of meal plans is also rationally related to the legitimate penological interest in the orderly and cost-effective provision of nutritional meals for a substantial number of inmates. The requirement that only

_____

[23] Whether plaintiff was on a therapeutic diet or not, he was still a diabetic and taking medication for his condition. As a diabetic, he presumably should have been watching his caloric and nutritional intake. The court notes that as part of plaintiff's mandatory disclosures, he has submitted the appeal of a 2009 grievance which refers to the Ramadan fast (even though he is not claiming a 2009 violation because he listed himself as Jewish that year). (Dkt. No. 59-1 at 15). The grievance appeal specifically states that participation in the Ramadan fast was not recommended for plaintiff, and that he could not receive both Ramadan meals and regular meals. The appeal decision further stated that in the future, plaintiff could either fast and receive the Ramadan meals "which could increase his blood sugar levels, or receive the regular meals recommended to assist in maintaining his blood sugar stability." (*Id.*) Thus, the choice was up to the plaintiff.

certain qualified individuals be able to alter an inmate's menu is also rationally related to this legitimate interest. Plaintiff clearly placed his health above his religious observance since he did not participate in the required Ramadan fast due to his inability to take required medication without food. There is no other way that plaintiff would be able to participate in the special Ramadan meal and "maintain the integrity of the therapeutic diet." Thus, plaintiff's First Amendment claim relating to Ramadan meals may be dismissed.

## 2. Clothing/Books on Tape/Religious Services at Coxsackie

Plaintiff lists items of religious clothing (head scarf, turban, and robe) that he wished to wear all though the facility and on outside visits. Plaintiff is free to wear these items in his cell and when he attends congregate services. He is also allowed to wear his kefiya (head scarf) in the shower in order to clean it. Plaintiff testified during his deposition that he does not own a turban because it is too expensive. (Pl.'s Dep. at 70-71). Plaintiff also claims that because he is dyslexic, he is entitled to books on tape and other reading aids for his religious books. Plaintiff does request injunctive relief with respect to his clothing claims and reading aids, and therefore, plaintiff may pursue his RLUIPA cause of action with respect to this claim to the extent that it relates to DOCCS policy in general.[24] With respect to attendance at religious services, plaintiff

---

[24] Plaintiff's remaining claims all relate to incidents that occurred at Coxsackie. Plaintiff is asking for injunctive relief and damages with respect to these claims. However, the only individuals who have been served relative to these claims are defendant Fischer and Ali. For the same reasons as stated above, defendant Fischer was not personally responsible for any of the issues that arose at Coxsackie, and thus, no damages could be assessed against him. Because he is no longer the Commissioner of DOCCS, to the extent that he could have provided plaintiff with injunctive relief, that is no longer possible, and the entire complaint must be dismissed as against defendant Fischer. Dr. Ali

names only Dr. Ali as responsible for failing to place plaintiff on "religious call-out," and only damages would be available for this alleged violation. Thus no RLUIPA claim is available for plaintiff's failure to attend religious services at Coxsackie.

Defendants first argue that plaintiff failed to exhaust his administrative remedies with respect to any of his clothing claims prior to bringing this action.

### a. Exhaustion

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia*, to excessive force claims)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675. The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

---

is also not in a position to afford plaintiff injunctive relief, but plaintiff has named DOCCS for purposes of RLUIPA. Dr. Ali is sued individually for his alleged failure to place plaintiff on call-out for religious services.

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state procedural rules, including meeting appropriate deadlines. *Jones v. Bock*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion is a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance ***prior to*** filing the federal action.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id*. § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's

exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[25]  Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement.  *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement.  *Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford*, it has noted in more recent cases, that the exhaustion requirement may be excused, as have other district courts.[26]  *See, e.g.*, *Macias v. Zenk*, 495 F.3d 37 (2d Cir. 2007) (using the three-part inquiry); *Davis v. State of New York*, 311 F. App'x

---

[25] *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special  circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[26] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have *not* been overruled in that respect.  In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)) (Breyer, J. concurring).  Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates*." *Id.* (emphasis added).  This statement implies that there are still exceptions that a court may consider.

397, 399 (2d Cir. 2009) (recognizing that there may be exceptions to the exhaustion requirement); *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011) (using the three-part inquiry); *Carlson v. Parry*, No. 06-CV-6621, 2013 WL 5354517, at *9-10 (W.D.N.Y. Sept. 24, 2013) (recognizing that the exhaustion requirement may be excused); *Morrison v. Hartman*, 898 F. Supp. 2d 577, 581 (W.D.N.Y. 2012) (same).

In support of their exhaustion argument, defendants have submitted the declaration of Karen Bellamy, Director of the DOCCS Inmate Grievance Program. (Bellamy Decl.) (Dkt. No. 67-7). In her declaration, Dir. Bellamy states that plaintiff did not file any grievances regarding his clothing, reading aids (books on tape), or attendance at religious services until March 29, 2012. (Bellamy Decl. ¶¶ 3, 4 & Ex. B). The grievance was not finally decided by the CORC until August 29, 2012. (*Id.*) This action was filed in the Southern District of New York on March 28, 2012, before he even filed his grievance and long before the CORC made a final decision on his grievance.[27] The court notes that plaintiff's original complaint contained claims regarding his religious clothing. (*See e.g.* Compl. ¶ 190 – head covering).

The court also finds that none of the exceptions to the exhaustion requirement apply in this case. It is clear that the grievance procedure was available to the plaintiff, and that none of the defendants prevented him from utilizing it. Plaintiff simply did not exhaust his remedies prior to filing this action, and there are no extenuating

---

[27] Director Bellamy states that plaintiff filed other grievances related to his religious clothing claims at Coxsackie, but these grievances were not filed until August 20, 2012. (Bellamy Decl. ¶ 5 & Ex. C) (Dkt. Nos. 67-7, 67-10). The grievances were not decided by the CORC until January 16, 2013 and March 16, 2013. (Bellamy Decl. ¶ 5 & Exs. C, D) (Dkt. Nos. 67-7, 67-10, 67-11).

circumstances that would excuse this defect. In his response to defendants' motion, plaintiff states that his second amended complaint was filed after the CORC decision, and that the length of time it took to get a CORC response should excuse the exhaustion requirement. (Dkt. No. 73-1, ¶¶ 28-29). However, plaintiff filed this action the day **before** he filed his first grievance regarding the Coxsackie claims. At that time, he would not have known how long it would take the CORC to decide his claims or even whether he would have to appeal all the way to the CORC.[28] Plaintiff could have been successful with his grievance and would not have been required to appeal. The fact that plaintiff filed his second amended complaint after the CORC finally denied his claims does not change this court's analysis. Plaintiff included those issues in his original complaint, and there was no excuse for failing to exhaust prior to bringing his initial filing. Subsequent exhaustion after suit is filed is insufficient to satisfy the PLRA requirment. *See Lee v. O'Harer*, No. 9:13-CV-1022, 2014 WL 7343997, at *6 (N.D.N.Y. Dec. 23, 2014) (citing *Neal, supra*); *Fuentes v. Furco*, No. 13-CV-6846,

---

[28] Plaintiff cites a case in which the court held that a lengthy delay in handling plaintiff's initial grievance "falls within the realm of one ignored by prison authorities . . . ." *See DeJesus v. Williams*, No. 06-209, 2007 WL 1201599, at *3 (D. Del. Apr. 23, 2007). In *DeJesus*, the court found that plaintiff filed his first medical grievance in October of 2005, and that the grievance report was not even received by the medical unit until seven months later in April of 2006, and after he had filed his federal complaint. *Id.* In this case, plaintiff filed his complaint the day *before* he filed his first grievance, and thus, the defendants could not be accused of "ignoring" his grievance. The facts in *DeJesus* are clearly not applicable to this case. The same is true for the second case cited by plaintiff. *See Jones v. Detella*, 12 F. Supp. 2d 824, 826 (N.D. Ill. 1998). In *Jones*, the court held that plaintiff filed his federal complaint more than nine months after the relevant hearing on his grievance and after contacting the Board twice after failing to receive a response within the appropriate time frame under Illinois rules. *Id.* The court held that plaintiff had sufficiently raised an excuse for the exhaustion requirement to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which assumes as true the facts stated in the complaint. *Jones* does not help plaintiff in this case.

2014 WL 4792110, at *2 (S.D.N.Y. Sept. 25, 2014) (citing *Neal, supra*); *Couvertier v. Jackson*, No. 9:12-CV-1282 (DNH/DEP), 2014 WL 2781011, at *4 (N.D.N.Y. June 19, 2014) (adopting Rep't-Rec.) (citations omitted). Thus, plaintiff failed to exhaust his administrative remedies prior to filing this action, and all his claims relating to Coxsackie may be dismissed for failure to exhaust administrative remedies.

### b. Merits

Even if plaintiff had exhausted his administrative remedies before filing this action, the court would recommend dismissing plaintiff's claims. Plaintiff claims that he should be able to wear a turban or kefiya, and his Jālābiyah robe throughout the facility and on outside trips. Plaintiff claims that the Sikhs are allowed to wear their turbans and other inmates are allowed to wear their jackets, throughout the facility. First, the court would point out that plaintiff does not, and has never owned a turban. (Pl.'s Dep. at 67). Plaintiff testified that he has a kefiya, and that a turban is "similar." (*Id*. 65-66). Plaintiff also stated that "another inmate" told plaintiff that he was supposed to wear his head covering at all times, but he did not remember who that inmate was and whether the inmate had any religious training. (*Id.* at 62-63). Plaintiff also testified that, although he can wear his kefiya in his cell, he does not wear it all the time, and in fact, only wears it approximately 65 percent of the time. (*Id.* at 64). Sometimes he forgets to wear it, and he does not wear it when it is dirty. (*Id.* at 63). Plaintiff's robe is white and is knee length. (*Id.* at 112). Plaintiff testified that he does not wear the robe in his cell because he does not want the robe to get dirty, but he is

allowed to, and does wear it, to services, because it is "dress-up" for going to church.[29] (*Id.*) Plaintiff also testified that he is allowed to wear the kefiya in the shower to clean it. (*Id.* at 55-56, 64).

By his own testimony, plaintiff does not wear his kefiya or his robe at all times even when he is allowed to do so. Thus, it is questionable that any policy that restricts plaintiff's use of these items to his cell, religious services, and in the shower (for his kefiya) substantially burdens the exercise of plaintiff's religion because it is questionable that plaintiff sincerely believes that he must wear these items "all the time." In any event, the court notes that DOCCS Directive No. 4202 was amended in July of 2014. The revised directive permits any male inmate, belonging to any faith group, to wear the type of turban that had previously been permitted only for Sikh males, apparently without limitation on the location.[30] *See Rossi v. Fischer*, No. 13-CV-3167, 2014 WL 5778702, at *4, 6 (S.D.N.Y. Sept. 11, 2014) (discussing the provisions contained in the revised directive). Thus, plaintiff's request for injunctive relief with

---

[29] Plaintiff also testified that he never wore his robe while he was at Upstate. (Pl.'s Dep. at 109).

[30] The court makes the assumption that the DOCCS policy was revised based upon *Singh v. Goord*, 520 F. Supp. 2d 487, 502 (S.D.N.Y. 2007). The revised directive discussed in *Singh* states that "Inmates are permitted to wear religious head-coverings as permissible in a correctional setting and outlined in the Religious Calendar." DOCCS Directive No. 4202(XIII) (Religous Headcoverings). This section further states that a facility Chaplain is to determine whether the head-covering is legitimate and whether it is being worn appropriately as noted and approved in the directive and the Religious Calendar. *Id.* No. 4202 (XIII)(A). The religious articles approved for bringing into DOCCS facilities are listed in DOCCS Directive No. 4911(J). Various items of religious clothing, including cloth turban headcoverings are described, without limitation on what religion may wear them. Directive No. 4911(J)(e) refers to a cloth "turban" head cover. An inmate may posses two outer turbans no larger than 66" by 36" and may possess up to three cloth under turbans no larger than 66" by 66" of various colors, except solid black, blue, grey, or orange. This turban sounds very similar to the head covering that plaintiff wishes to wear. Plaintiff's response to defendants' motion for summary judgment states that the kefiya may be "52 X 52 to 72 X 72 inches." (Dkt. No. 73-2, ¶ 28).

respect to his head covering is moot.

The court also notes that although plaintiff claims that he is dyslexic, there is absolutely no showing that he cannot read or that he would need books on tape for religious studies. In plaintiff's previous case in the Northern District of New York, Magistrate Judge Hummel recommended dismissing an ADA claim because plaintiff's 2006 test scores from the Test of Adult Basic Education ("TABE") showed that plaintiff had an 8.7 grade reading level, indicating that he could read proficiently. *Keitt v. Annetts*, No. 9:10-CV-157, at 4, 13 (N.D.N.Y. Dec. 3, 2012) (Def.s' Ex. B). Magistrate Judge Hummel concluded that a rational fact-finder would not find that plaintiff had an impairment that substantially limited a major life activity. *Id.* Senior Judge McAvoy adopted the recommendation, and the Second Circuit dismissed plaintiff's appeal as frivolous. *Keitt v. Annetts*, No. 13-972 (2d Cir. Aug. 7, 2013).

Defendants ask this court to find that the dismissal of plaintiff's 2010 claim based upon dyslexia collaterally estops plaintiff from claiming in this action that defendants violated his religious rights and his rights under the ADA or the Rehabilitation Act when they refused to "reasonably accommodate" plaintiff's dyslexia by giving him religious books on tape or other reading aids.[31] Plaintiff argues that the defendants' "serious misconduct" should prevent them from asserting collateral

---

[31] The court does note that Judge Hummel found that plaintiff's subsequent TABE test showed a fifth grade reading level, but a test that was taken near the filing of plaintiff's 2010 federal action showed that he had no reading ability. (Def.s' Ex. B at 4). Plaintiff claimed that he cheated on the first two tests by having another inmate take his tests. However, the evidence showed that such a thing was impossible since an inmate identification card was required to sit for the test, and the proctors were the very teachers who knew the plaintiff. (*Id.* at 5). The implication is that plaintiff purposefully scored low on the test in order to substantiate his claim.

estoppel.[32] (Dkt. No. 73-2 at ¶ 29).  Plaintiff claims that he did not have a "full and fair opportunity" to litigate because he was denied "denied documentary evidence concerning his dyslexic report." (*Id.* ¶ 30).

Res judicata includes two concepts: claim preclusion and issue preclusion, also known as collateral estoppel. *Rivera v. City of New York*, __ F. App'x __, 2014 WL 5463320, at *2 (2d Cir. Oct. 29, 2014).  Under the doctrine of res judicata, or claim preclusion, a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.  The doctrine bars subsequent litigation if the earlier decision was (1) a final judgment on the merits, (2) the previous action involved the plaintiff or those in privity with him, and (3) the claims asserted in the subsequent action were, or could have been raised in the prior action. *Id.* (quoting *Monahan v. New York City Dep't of Corr.*, 214 F.3d 275, 285 (2d Cir. 2000)). *See also Ajamian v. Nimeh*, No. 1:14-CV-320, 2014 WL 6078425, at *2 (N.D.N.Y. Nov. 13, 2014) (citing *EDP Med. Computer Sys., Inc. v. United States*, 480 F.3d 621, 624 (2d Cir. 2007) (internal citations and quotation omitted)).  Under claim preclusion, even if the plaintiff's claims are based upon different legal theories, they are barred in the subsequent action, provided they arise from the same transaction or occurrence. *Id.* (citing *LTec Elecs. Corp. v. Cougar Elec. Org., Inc.*, 198 F.3d 85, 88 (2d Cir. 1999) (per curiam)).

The doctrine of collateral estoppel provides that once a court has actually and necessarily decided an issue of fact or law necessary to its judgment, that decision may

---

[32] As stated above, the only remaining individual defendant from Coxsackie is Dr. Ali.

preclude relitigation of the issue on a different cause of action involving a party to the first case. *Rivera v. United States*, No. 3:10-CV-1970, 2012 WL 3043110, at *2 n.5 (D. Conn. 2012) (discussing collateral estoppel) (citations omitted). Collateral estoppel is applicable if (1) the issues in both proceedings are identical; (2) the issue of law or fact was "actually litigated and actually decided" in the prior proceeding; (3) the party against whom preclusion is sought had a full and fair opportunity for litigation in the prior proceeding; and (4) the previously litigated issues were necessary to support a valid and final judgment on the merits. *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008) (citing *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)); *Wade v. City of Kingston*, No. 1:13-CV-623, 2014 WL 4897244, at *4 (N.D.N.Y. Sept. 30, 2014) (citing *Davis v. Halpern*, 813 F.2d 37, 39 (2d Cir. 1987) (citation omitted)). *See also NML Capital, Ltd. v. Banco Central de la Republica Argentina*, 652 F.3d 172, 184-85 (2d Cir. 2011) (discussing factors considered for collateral estoppel). Whether a previous federal court judgment has preclusive effect in a subsequent action is a question of federal common law. *NML Capital, Ltd.*, 652 F.3d at 184 (citing *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008)).

The issue of plaintiff's dyslexia was finally litigated in plaintiff's 2010 action. Although plaintiff claims that he did not have a full and fair opportunity to litigate the issue, even a cursory reading of Magistrate Judge Hummel's Report-Recommendation refutes this allegation. Magistrate Judge Hummel reviewed plaintiff's pre-incarceration educational records, produced by plaintiff himself. (Def.s' Ex. B at 3-4). When plaintiff was deposed in that action, he stated that he was dyslexic, not illiterate, and

that he could read bold print. (*Id.* at 4). A non-party, director of education for DOCCS reviewed plaintiff's records, and found that nothing in those records indicated that plaintiff was dyslexic. (*Id.*)

In recommending that the court grant defendants' motion for summary judgment, Magistrate Judge Hummel found that plaintiff was not a qualified individual with a disability. Although reading is considered a major life activity, plaintiff had failed to establish that his alleged impairments "limit his ability to hear, read, think, or communicate in a substantial manner." (*Id.* at 12). Because plaintiff failed to establish the first prong of an ADA claim, the claim was dismissed. This issue was central to plaintiff's ADA claim, and there is no indication that plaintiff was prevented from litigating his claim. Thus, plaintiff cannot base another ADA claim on his alleged dyslexia. In any event, plaintiff was not prohibited from obtaining his own books on tape and was not prevented from attending religious worship because of his impairment.

Additionally, defendants have submitted defendant Ali's declaration, indicating that plaintiff arrived at Coxsackie on March 13, 2012, and that he was transferred out of that facility on July 9, 2013. (Ali Decl. ¶ 3). Defendant Ali alleges that approximately two weeks after plaintiff's arrival at Coxsackie, he filed a grievance against Dr. Ali, alleging that he failed to provide plaintiff with books on tape and failed to place him on call-out for religious services. (Ali Decl. ¶ 4 & Ex. B). Dr. Ali claims that prior to April 12, 2013, plaintiff never requested such attendance. (Ali Decl. ¶ 4 & Ex. C). With respect to the books-on-tape and "auxiliary" aids, Dr. Ali states that he never had any

involvement in making decisions with respect to plaintiff's requests. (Ali Decl. ¶ 5). Dr. Ali has attached the "reasonable accommodation" paperwork that was handled by other individuals. (Ali Decl. ¶ 6). Thus, Dr. Ali had no personal involvement in denying plaintiff his desired "reasonable accommodations," and any claim for damages against defendant Ali would be subject to dismissal for lack of personal involvement.

## VI.   **Miscellaneous Statutes and Claims**

Plaintiff has listed a variety of statutes upon which he bases his claims. The court notes that lack of personal involvement is also fatal to a claim under 42 U.S.C. §§ 1981[33] and 1985.[34] *See Kantrowitz v. Uniondale Union Free School Dist.*, No. 08-CV-3592, 2011 WL 4593147, at *17 (E.D.N.Y. Sept. 30, 2011) (discussing both section 1983 and 1981) (citing *inter alia Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009); *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987)); *Keitt v. New York City*, No. 09 Civ. 8508, 2011 WL 4526147, at *3 (S.D.N.Y. Sept. 29, 2011) (the personal involvement requirement also applies to conspiracy claims under section 1985). Thus, any claims

---

[33] Section 1981 provides in relevant part, that all persons within the jurisdiction of the United States shall have equal rights to make and enforce contracts, to sue and be sued, to give evidence, and to the full benefit of all laws and proceedings for the security of persons and property as enjoyed by white citizens. 42 U.S.C. § 1981(a).

[34] To establish a claim under section 1985(3), plaintiff must establish a racial or class-based conspiracy to deprive a person or class of persons of equal protection of the laws. *Id.* Plaintiff must also establish an act done in furtherance of the conspiracy, and he must establish that he was injured in his person or property as a result. *Id.* Plaintiff's allegations of "conspiracy" are completely conclusory. Conclusory allegations, lacking any factual foundation, are insufficient to support a claimed conspiracy to violate another's civil rights. *See, e.g., Jackson v. County of Rockland*, 450 F. App'x 15, 19 (2d Cir. 2011) (citing *Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) (finding allegations of conspiracy "baseless" where the plaintiff "offer[ed] not a single fact to corroborate her allegation of a 'meeting of the minds' among the conspirators")); *Ciambriello v. County of Nassau*, 292 F.3d 307, 325 (2d Cir. 2002).

under sections 1981 and 1985 may be dismissed.[35]  In addition a claim under 42 U.S.C. § 1986 for failure to prevent the violation of a person's civil rights may not exist absent a viable section 1985 claim. *See Todd v. Brookhaven Nat. Lab*., 407 F. Supp. 2d 404, 415 (E.D.N.Y. 2006). Accordingly, any claims plaintiff may have based upon section 1986 may also be dismissed.

Plaintiff also cites 42 U.S.C. § 1988 as a "basis" for his claims.  Section 1988 provides for the applicability of certain laws and provides for attorneys fees for prevailing parties in the enforcement of other sections of the civil rights laws, but is not a separate basis for jurisdiction. 42 U.S.C. § 1988(a)-(c). *See Reid v. Toyota Motor Credit Corp*., No. 12 Civ. 7436, 2013 WL 3776201, at *2 (S.D.N.Y. July 18, 2013).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 67) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**, and it is

**RECOMMENDED**, that plaintiff's cross-motion for summary judgment (Dkt. No. 73) be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT**

---

[35] It has also been noted in another case filed by this plaintiff in the Western District of New York, that it is questionable whether a section 1981 claim is viable against a state actor when the plaintiff also raises a section 1983 claim. *See Keitt v. Schun*, No. 11-CV-438, 2014 WL 347053, at *3 n.7 (W.D.N.Y. Jan. 30, 2014).  When a plaintiff alleges section 1981 and section 1983 for the same conduct, the court may dismiss the section 1981 claim or deem it merged with the section 1983 claim. *Id.* (citing *Wynder v. McMahon*, No. 99 Civ. 772,  2013 WL 1759968, at *5 (E.D.N.Y. Apr. 24, 2013)).

**TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE**

**APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing

*Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C.

§ 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: January 8, 2015

Hon. Andrew T. Baxter
U.S. Magistrate Judge